## WIGHTMAN *vs.* STODDARD.

### *In the matter of proving the last Will and Testament of* SUSAN CADY BROWN.

A WILL contested as having been procured by undue influence, was admitted to probate, on proof of the origination of the testamentary act by the decedent, its subsequent recognition, and the conformity of its provisions to her intentions and declarations indicated to disinterested parties.

A mistake in an unessential part of a will is unimportant, if the proof otherwise be satisfactory. Where the mind is debilitated and there is no evidence of instructions, it is proper to inquire for some recognition of the act, and either for declarations of testamentary intentions, or such circumstances as tend to show that the bequests were probable and consonant with the the state of the wishes and affections. In such a case it is not necessary the will should be read to the decedent, but knowledge of the contents may be proved by facts and circumstances.

S. K. WIGHTMAN, *for Proponent.*

I. The will was duly subscribed, published, and attested.

II. The testatrix had sufficient capacity to make her will.

III. The will was not executed under any fraud, duress or undue influence.

IV. It was made in conformity to her oft repeated declarations of her intentions, before and during her last sickness, and was her own free will.

V. The will was perfectly consistent with her circumstances and connections.

T. J. GLOVER, *for Contestants.*

I. The decedent was in advanced age, of feeble health and weak in mind; her will was executed under such circum-

stances as throw upon the executors the burden of showing that the paper offered in probate contained truly her last will. They should show that the proper precautions and explanations were had, that she should of her own volition and free act determine the disposition of her property. They should show that she knew what provisions were in the will, and that these provisions were dictated by herself.

II. This will was never read over to her; there is no proof that she gave instructions in accordance with this paper.

III. The misnomer of her own sister, called in the will "Mitchell," a name by which she was never known, shows either that the will was never read over or that she was too far gone to know the name of her sister.

IV. There is no satisfactory proof that the will was fairly made, and expressed her last wishes in regard to her property.

V. The manœuvring, the long sittings, the repeated visits, and numerous visitors, all church members, show that a moral force was brought to bear on her, which, in her weak state, she could not resist. Of the six or seven male members of the church who participated more or less in getting up the will, not one has been examined except Sarles.

VI. The will is unequal and unnatural in its provisions, nearly all the legacies are for church purposes, in which the parties who got up the will were deeply interested; the large provision for Mrs. Trumbull is extraordinary, when you consider their want of sisterly affection; while her other sisters are left in absolute poverty. There is no residuary bequest. It would seem they did not know she had any more property, or, being ignorant of the effect of a will, she kept the residue to live on.

VII. The attempt to show any falling out between Mrs.

Stoddard and the decedent fails. There was no reason for cutting off either Mr. or Mrs. Stoddard.

THE SURROGATE.—The decedent was a single woman sixty-seven years of age, in a state of feeble health, but capable of managing her business and taking care of herself, until the occurrence of the accident which was the cause of her death. Her next of kin are the children of a deceased sister, and three sisters still surviving, one residing in the State of Connecticut, another living in an asylum for aged females in the city of Brooklyn, and a third residing in this city. The latter is apparently competent to provide for herself, the former two are in indigent circumstances. The decedent, for several years previous to her decease, had boarded in the family of Mrs. Stoddard, one of her nieces, but about the middle of May, 1854, she changed her residence to the house of Mrs. Hall, in the Sixth Avenue. At this place, on the eighth day of August, she suffered a severe burn from the ignition of camphene. On the fourteenth of that month, in consequence of the contemplated absence of Mrs. Hall from the city, she went to the house of Mrs. Coit, a friend residing in Brooklyn, where she remained until her decease on the ninth day of September. By her will, bearing date the fifth day of September, 1854, she bequeathed to the American Bible Union, one thousand dollars ; to the American Baptist Missionary Union, five hundred dollars ; to the trustees of the first Baptist Church in the city of New York, five hundred dollars for Baptist Home Missions, five hundred dollars for the use of said church, and five hundred dollars for the use of the poor of said church ; to the trustees of the Bridge street Baptist Church, in the city of Brooklyn, two hundred dollars for the use of said church ; to her sister Louisa Trumbull, one thousand dollars ; to her sister " Elizabeth Mitchell, widow, the sum of one hundred dollars," and to her sister, Thankful Rodgers, two hundred dollars. The Rev. Spencer

H. Cone, Deacon William Hillman and Stillman K. Wightman were nominated executors.

The will was subscribed by the decedent, and its execution duly solemnized according to the requirements of the law. The probate is resisted on the allegation that the decedent was of weakened capacity, and the will was unduly procured.

The effort to impeach the decedent's testamentary capacity prior to her last illness, was not even plausibly supported. She managed her property with care and prudence, and for aught that was exposed in the proof, was abundantly competent to take care and dispose of it with sense and judgment. By industry, and habits of economy amounting almost to penuriousness, she had gathered a personal estate amounting to seven or eight thousand dollars, a very considerable sum for a person of her humble calling. About one half of this amount was bequeathed to charitable uses, and thirteen hundred dollars were distributed in unequal proportions among her sisters. The residue was not disposed of, and will pass by operation of law to the next of kin, as in case of intestacy.

I shall first consider, in determining the validity of this will, what proof was offered to show that the decedent's mind was generally impaired and weakened. Mrs. Hall, with whom she resided from May to August, 1854, states that she seemed to be losing her faculties rapidly. This broad and sweeping opinion, however, had no other foundation than that contained in the following extract from the deposition of this witness. "She came down stairs one day when she thought she heard the dinner bell ring, when it had not rung; and then another time we would ring it and she did not hear." Mrs. Thomas testified that the decedent had been evidently failing for the last year of her life, in body and in mind. But instead of giving any facts justifying this conclusion, this lady in another portion of her testimony says expressly that before her last illness the decedent "was very talkative, but it was always good, solid, sound talk." Mrs. Cargill, the daughter of Mrs. Thomas, stated that she had seen "something strange" in the decedent's deportment eighteen months

since. It turned out that in the summer of 1853, Miss Brown, while walking to the house of the witness had been overcome with the heat, and was brought to the door by a police officer. Restoratives were used, but she continued in a flighty state of mind the remainder of the day. As I understand it, this was a case of sun-stroke, and it gives no clue to the general state of the decedent's mental ability. Mrs. Cargill also says, that the decedent occasionally indicated " a failure of her mind; she related things childishly; she seemed quite silly and laughing at times; I think she forgot things that transpired, immediately; her memory appeared to be good for things which were long past." Such opinions, without a solitary fact distinctly remembered substantiating them, and relating as they do, more to manner than to matter, can have little, if any, influence, unless in a nicely balanced case. . Miss Napier, an adopted daughter of Mrs. Thomas, states that she " never observed any loss of memory," in the decedent, until her last sickness. Mr. Richards testified that Miss Brown's " health for the past two or three years was getting quite feeble. On most subjects she appeared to remember moderately well: on others I have known her to show quite a want of memory." He then mentioned an instance where the decedent had forgotten the receipt of a small sum of money, five or eight dollars, several months after it was received, and again asked for it, after it had been paid a second time. Maria Smith, who resided with the deceased for a number of years while she boarded with Mrs. Stoddard, declared that she noticed a failure in her memory—that " she often told a thing over again a number of times, the same day or different days." This is all the evidence, tending to detract from the general capacity of the decedent, and so far as it discloses any facts, it amounts to nothing of consequence. Occasional slips of memory are of no importance. There must be a full and substantial impeachment of this faculty before the court can say the party was incapable.

I next turn to the testimony bearing upon the state of the decedent's mind during her last sickness. Mrs. Thomas who

saw her but once during this period, states that during a portion of the interview, she was not, in her judgment, altogether in her right mind. Her statement is this: " Miss Brown would fall off and ask perhaps some improper questions: she asked me if I would not take some brandy." This was all Mrs. Thomas specified as having occurred of an adverse character during nearly two hours' conversation. Mrs. Cargill visited the decedent about two weeks before her death, but I cannot perceive that she observed any thing remarkable, except her very great cheerfulness. Miss Napier called upon the decedent seven times during her last illness. The first visit, Miss Brown knew her, but " she was very much excited" and " talked hurriedly." At the second call, she did not see her. The third time she went with her mother, Mrs. Thomas; the decedent knew her and got up, out of bed, while they were there. The fourth visit, the witness says, " she did not know me. When I went into the room she was in bed; I asked her if she knew me, and it was a long time before she could remember me at all. She talked about different people, and things concerning herself, as to which I knew nothing at all." At the fifth visit, the witness states " she did not know me." At the sixth visit, she says " she did not know me any of the time I was there that day, except a minute or two at a time." The next call was on the day the decedent died, and the witness states " she did not at first recognize me; I don't think she really knew me while I was there." It seems to me apparent from what occurred during the fourth, fifth, and sixth interviews, that this lady was mistaken in the conclusions she drew as to a want of recognition on the part of the decedent. For example, she says " when I went in, I always went to the bed, spoke to the decedent, and shook hands with her. At the fourth visit there was no one sitting in the room: one of Mrs. Coit's daughters was in and out. I always asked her how she felt, and whether she thought she would get well. She always said she thought she would get well, until the last two visits. I don't remember particularly how she was at the fourth visit: she called me by name at

this time when I shook hands with her." Again, in respect
to the last visit of the second week, the fifth, the witness
says, "she called me by name, but I had no particular con-
versation with her;" and as to the next, the sixth, "she
called me Kate, once during that interview, and I presume
she must have known me, from that; that was after I first
went in, some little time: she looked at me some time, before
she answered, and then said she thought it was Kate." Tak-
ing all these statements in connection with the fact that the
room was generally kept darkened by the shutters being
drawn to, there would appear to be no reasonable ground for
doubting that the decedent recognized the witness at each
one of these interviews. If it had been otherwise the circum-
stance would have been singular, for in all other cases the
decedent showed no sign of want of recognition in regard
either to her attendants, the members of the family with
which she was domiciled, or the friends who called upon her
during her illness. Mr. Richards, who had three interviews
with her anterior to the date of the will, does not, in his nar-
rative of what occurred, give the slightest indication of men-
tal disorder. It was not till the day before her death that he
observed tokens of her mind wandering, though he previously
thought her expectations of returning to New York unrea-
sonable and strange. But it is apparent that during the en-
tire period after the accident, she underrated the severity of
the burn, and treated the affair much more hopefully than it
was viewed by her friends; so that even after the will was
executed she expressed anticipations of being able to return
to New York. Ellen O'Connor, who attended the decedent
for the two weeks preceding the last week of her life, testi-
fies that she observed nothing out of the way in her conduct.
She states, however, that on one occasion the decedent said,
" it was something so singular: she had a sister who was blind
and who was coming to her sight again:" the witness asking
where she was? " she replied, in the Blind Asylum." This
circumstance is considered by the counsel for the contestants
as an instance of mental aberration: if so, it stands alone;

but it must be remembered that the decedent's sister Elizabeth was in an asylum, and though not blind, is an old lady wearing glasses. If there were any thing worth remarking as to the state of her sight, there are elements enough in the facts to form ground for misunderstanding on the part of the witness. For example, suppose the decedent said " she had a sister in the Asylum, whose eyesight was improving," how easily could such a statement have been mistaken, and on a vague recollection be transformed into something like the conversation given by the witness. It is dangerous to test a person's capacity by a single circumstance, opposed to the general drift of all the testimony, unless we can exclude every possible hypothesis consistent with rationality. Mary Danvers, a seamstress at Mrs. Coit's, was frequently in the decedent's room, and she fails to specify a single incident marking mental aberration. This closes the proof on the side of the contestants, so far as relates to Miss Brown's testamentary capacity, and, taking it all together, I think on their own showing she was competent to perform a valid testamentary act, though in the absence of other evidence, the court would feel bound to see that at the time of the execution of the will there were no circumstances of suspicion.

But, on the other hand, the proponent has established affirmatively and by satisfactory proof, that Miss Brown retained the full possession of her faculties through her entire sickness, until just previous to the close of her life. Dr. Burke, her attending physician, who was called in on the 21st of August, describes her as conversing readily, and as very patient and hopeful. He mentions that she once made some inappropriate remark as he was dressing her wound, and her sister observed that " she wandered at times," but this he thinks was after the date of the will. It is quite possible that there may have been occasional wandering at night, when the hectic fever increased shortly before her decease; but, suffering as she was from excruciating pain, remarks made in a half waking state afford no criterion for judging of her condition in the day, when her fever

had subsided, and she was more thoroughly aroused. The doctor says, " as far as I could judge of her, during her illness, her mind was good. I found nothing wrong with her mind: I could not perceive anything. I thought that on the Friday preceding her death, she spoke as rationally as ever: I did not perceive any change. . . . I discovered no symptoms of derangement or aberration of mind, during all the time I visited her. I do not think her disease had the least effect upon her mind at all, except on the Saturday of her death: of course then as she was dying her mind was clouded." Again, elsewhere he reiterates, " during the whole of her illness I did not see any sign of wandering in her mind." This is very explicit, and is entitled to much consideration, in view of the profession of the witness, and the opportunities he possessed for forming a correct judgment. The subscribing witnesses to the will were strangers to Miss Brown, and their means of forming an opinion as to her condition were limited. Mr. St. John visited the decedent some twelve or fifteen times while she lay sick at Mrs. Coit's, having been sent for by her at an early period of her illness. He testifies that " down to the day of her death " . . . " he neither heard nor saw any thing that indicated aberration of intellect or unsoundness of mind." Mrs. Coit who, perhaps, had the very best means through daily intercourse, of making observations and discoveries, who was in her room daily, at all hours and on various occasions, testifies that the decedent generally read a little every day, and she saw her reading the day before she died; and she says very broadly, " from the time Miss Brown came, to her death, I did not hear anything from her indicating wandering of intellect or unsoundness of mind."

But, although this evidence is entirely satisfactory to my mind in respect to the decedent's ability to make a will, yet her low and weak condition renders it quite proper to examine whether any traces of undue influence can be detected. These are to be sought, if anywhere, in facts relating to the conduct of the parties benefited by the provisions of the

will. It does not appear that the Rev. Mr. Sarles, the pastor of the Bridge Street Church, saw Miss Brown until the day the will was made, and the circumstances indicate he was not aware his church was interested until the instrument was just about to be executed. He was present at that time for the purpose of becoming an attesting witness, and on the interest of the church being intimated, another witness was called in. Mr. Hillman, who had the direction of the arrangements for the preparation and consummation of the will, was not a volunteer in the matter. At an early period of her confinement, the decedent sent for Mr. St. John, and stated that she wished to arrange about the disposition of her property. She requested him to see Mr. Hillman, who would be in town about the first of September. Subsequently, at another interview, she expressed some anxiety as to her situation ; and the witness wrote a note to Mr. Hillman, at her instance. That this desire to communicate with Mr. Hillman on the subject of her testamentary dispositions was not of recent origin is manifest from her statement to St. John, " that she had intended to do this business the winter previous—that she had told Deacon Hillman she wanted to see him particularly—she expressed regret she had not done it then—that she had told him she wanted him as the person to attend to that business." Now, there was no concert of action between St. John and Hillman, for the former testifies that he never saw the latter whilst the decedent lay sick, and that he did not even know when the will was in process of being made. Again, Mrs. Coit proves that the decedent sent for Mr. Hillman two or three times before he came, and that she communicated to the witness the purpose for which she desired his attendance. It is quite plain, from all these coincident facts, that there was no unsolicited interference on the part of this gentleman in the transaction in question. He was called there, and was in truth the agent selected by the decedent. Of this there can be no doubt. But if anything were wanting to confirm this view, it is afforded in the testimony of Mrs. Cargill. In the course of a visit, about two

weeks before the decedent's death, the former remarked to her that " she ought to have some one to look after her affairs in case of death. She said she had been thinking of that all day. She said Mr. Hillman was not in town, and she was going to send for him as soon as he came. She said he had always transacted her business for her, and that he would procure a lawyer also. I asked her if her memory was strong enough to arrange her things as she wished. She replied she had fixed them all right. I enforced upon her not to neglect it, and she said she would not." This is evidence from one of the contestants' witnesses, and agreeing as it does with other and independent proofs on the side of the proponent, it is conclusive to my mind of the origination of this testamentary act by the decedent. It also shows on her part previous meditation as to her posthumous arrangements, and fixed determinate conclusions. Mr. Hillman, then, was her own chosen agent in this last and solemn act of her life, he had previously been her business friend, and earned her confidence, and he had been spoken to on this very subject, when she was in health, and at no very remote period. He is no legacy-hunter, drawn to her bed-side by the scent of the prey, but attends the woman at her own invocation. He is sent for—the preparation of the will is delayed until his appearance, and as soon as he presents himself a professional adviser is called in, and after reasonable deliberation, the matter is consummated. Something fell from Doctor Burke in respect to the decedent's declarations during the course of her sickness, that certain persons were importuning her to make a will. The doctor was not positive that Mr. Hillman's name was mentioned in this connection, and it is clear from all the proof that Mr. Hillman had not called on the decedent until about the time the will was made. This shows, however, that Miss Brown had no difficulty in resisting importunity and taking her own way and selecting her own agent, and her own time. But three interviews between the decedent and Mr. Hillman are indicated in the proof—the first when it is to be presumed she communicated her testa-

mentary wishes, the second when he attended with counsel, and the third when the will was executed. In all the circumstances, then, which have been disclosed, no one appears to have been privy to the decedent's testamentary wishes, so far as they were directly connected with the making of her will, except Mr. Hillman and the counsel, although there are collateral declarations in proof, made by her to other parties. Nor is there any appearance of effort to bias her mind or to interfere in the subject, save such as she seems to have resisted.

On looking into the occurrences attending the *factum*, nothing unusual appears. The number of persons present is accounted for by the fact that the Rev. Mr. Sarles and Mr. Skinner, who came for the purpose of acting as subscribing witnesses, finding their church to be interested, refrained from acting in that capacity, and two other witnesses were called in. The decedent was assisted to rise; she sat up on the side of the bed, and to the question of Mr. Wightman, " if the will was made as she directed and as she wanted it," replied in the affirmative. She signed it with her own hand, saying she guessed "they could read that,—she thought that would do," and " now that was through she should feel easier." And thus the matter was begun, continued and ended, without any trace, so far as I can perceive, of improper influence, suggestion or dealing; but, on the contrary, with various signs of origination and volition. There are two circumstances, however, which deserve some notice. Ellen O'Connor states, that on the Friday of the week before her decease a gentleman spent the evening with the decedent, and after his departure, the witness heard her say, " I won't do it—I won't do it for them. I shan't do it." Mary Danvers. testifies that " the second day she was making her will" she overheard Miss Brown say, " they wanted to know how much money she had, and they should not know." The decedent was in the habit of talking aloud to herself, and Mrs. Coit testifies that once on passing her door she heard a similar exclamation, " they shall not have it, I will not do it." The

witness asked her "what was the matter—if she wanted any thing," and the decedent replied, "Mrs. Coit, I was thinking of my nieces; they have treated me so badly, all they want of me is my money, they shall not have it—and I suppose I thought out loud." Mrs. Coit adds, "some person was present, Mary Danvers or Miss O'Connor." This explains the first circumstance; and as to the second, it shows nothing more than that the decedent refused to disclose the extent of her fortune; that such was her purpose, and she had will enough to adhere to it. The inquiry, if made by the parties she had called in to assist her, was natural and proper upon an occasion of this kind, and shows no impertinent curiosity or interference.

One of the decedent's sisters named as a legatee in the will, is therein called "Elizabeth Mitchell." It appears by the evidence of Mrs. Gunton, the decedent's sister-in-law, that Elizabeth was never known to her by the name of Mitchell, that more than twenty years ago, she married a man named Cogan, with whom, however, she only lived a few months. This man's name was Michael, and the draftsman was possibly led into this error by that circumstance, or the decedent may herself have mistaken the name. As to the substance of the description of the legatee, however, there was no mistake. The bequest was to her sister Elizabeth. An error as to non-essentials is unimportant if the proof in other respects be satisfactory. The counsel for the contestants pressed, with much force in this connection, the failure to show that the will had been read over to the decedent before execution. Now though the law presumes knowledge of the contents where the capacity is sufficient, still reading the will is the best proof of that, and in a case of contestation it is better to rely upon facts than upon presumptions. In the absence of evidence that the will was read (*Fincham* vs. *Edwards*, 3 *Curteis*, 63,) to Miss Brown, and in view of the state of her health, and the question raised as to the vigor of her mental faculties, it is proper to inquire for recognitions of the act, and declarations of testamentary intentions, and also to see

how far the dispositions effected were probable and consonant with her affections, her likes and dislikes. The same day, after the will was made, the decedent spoke to Mrs. Coit on the subject, "said it was finished, that she felt relieved rather than fatigued" . . . remarked to her sister, Mrs. Trumbull, that she had " taken care" of her, and " spoke of the Bible Union . . . that she had given them what she had intended to." The Rev. Mr. Sarles saw the decedent a day or two after the will was executed, and she observed to him that " she felt greatly relieved since the will was made." Mr. St. John, who visited her the same day or the day after the will was signed, says " the decedent sent for me, she said she wanted to see me to express her gratitude for the interest I had taken, and for what I had done, that she had the business now all arranged, that she wished to express her satisfaction that every thing had been done according to her wishes." Dr. Burke also testifies that on Tuesday she said " Some persons were coming to make her will," and that on the day succeeding she spoke of the transaction as having caused her some excitement, so that she could not expect to feel as well as usual. Thus we have several distinct and independent evidences of recognition of the act after it was performed, together with some notice of the particular provisions contained in the instrument. Nor is there a word of complaint that she had been beguiled into any bequest, or been importuned or led against her will or inclinations. These are important facts in the absence of express proof that the will was read to or examined by the decedent.

As to the probability of the will being conformable to her wishes, there is proof that although she had resided in Mr. Stoddard's family many years, and always spoke of him in the highest terms, yet she was estranged from her niece, Mrs. Stoddard, and had recently left her house under circumstances by no means pleasant. Upon this point we have her declarations to Mr. St. John and Mrs. Coit. It is unnecessary to inquire whether this state of feeling was justified by the circumstances, so long as there was some probable cause.

Certain it is that the decedent would not, until the day before her decease, permit notice of her sickness to be sent to that family, though the propriety of doing so was suggested to her. So far as regards the gifts to charitable uses, the decedent expressed herself frequently. Mr. St. John testifies that she repeatedly stated to him some of her purposed bequests. He says, " she named two or three objects: one was the poor of the First Baptist Church in the city of New York: another was the American Bible Union; and she mentioned the Central Baptist Church in Brooklyn . . . she stated these objects particularly, they all lay near her heart, and she thought she should make some provision for them . . . she always spoke, years previously, that she intended to do something for the poor of the Baptist Church in New York, and at the first interview she said her mind was *still determined* on that . . . that she would do something for the church and something for the poor of that church, and something for the Bible Union." Mrs. Coit deposed that the decedent told her the object for which she wished to see Mr. Hillman, the first time she sent for him, that " she had a little money she wanted to dispose of, and she felt as though it was quiet and retired where she was, and she could do it there better than anywhere else. She said she belonged to several societies in the church, and she wished to make a donation to each of them, as she felt she had the means; that she wished to reserve enough herself to live upon and to dispose of after her death, among her friends. What she gave to these societies, she said, she intended *to put the interest to the principal* yearly . . . After she had made her will, she said she had not given away all her money. I asked her how much she had to dispose of, and she said she had not given away all: she had left enough to divide among her relatives when she died: they might have it when she had done with it; she might live ten years." As to her relatives Mrs. Coit says " I heard the decedent say she felt indebted to Mrs. Trumbull for her kindness, that she always stopped there on the Sabbath, felt it was her home."

That the decedent was favorably inclined towards the Baptist Church and its institutions was not remarkable. During her illness she frequently spoke on the subject, "She esteemed the church," says Mrs. Thomas, "very much; was favorable to missions and missionary societies, more so to the home mission than the foreign." She had been connected with the Baptist Church over forty-two years; the Rev. Dr. Cone who was prominent in the Bible Union was her pastor, and Mr. Hillman was a deacon in that church. For a single woman without any immediate family of her own to attach her affections, it was not unnatural that her mind should be directed towards benevolent purposes connected with her religious associations. Whether it would not have been better to regard more the condition of her indigent relatives, was for her to judge. We have nothing to do with her determination in that respect except to see that she had mind enough to act, and that she had her own way in the provisions of her will. She was not totally forgetful of her relatives, even in the will, and reserved a considerable sum to which they will be entitled under the statute of distributions. The parties called in to aid in this testamentary act, intervened at her request, no indication of any influence is exposed, the provisions accorded with her declarations, both before and after the transaction, they are not repugnant to the state of her affections, so far as illustrated by the proofs, and in my judgment she had sufficient strength of mind to direct the terms of her will to suit herself; and power of volition enough to resist importunity, if it had been attempted. I have no doubt that in upholding this instrument the court will be sustaining her deliberate wishes and intentions, and such as she would have expressed and carried out had none of these parties against whom suspicion has been cast, been present; in other words, that this is really and truly her own unbiased act, originating with her and effectuated by her, without the procuration or influence of others. There must, therefore, be sentence of probate.